Opinion for the Court filed by Senior Circuit Judge SILBERMAN.
Opinion concurring in part and concurring in the judgment filed by Circuit Judge GRIFFITH.
SILBERMAN, Senior Circuit Judge:
This case presents the question whether the Secretary of the Department of Homeland Security-acting through the Coast Guard-may impose certain conditions (nonfinancial in nature) upon the release of ships suspected of violating the Act to Prevent Pollution from Ships.
Ship owners appeal from the district court's holding that the case is nonjusticia-ble. We disagree as to justiciability, but affirm on other grounds.
I.
The Act is a federal statute passed to implement various environmental obligations that the United States assumed when it entered into the International Convention for the Prevention of Pollution from Ships. See 33 U.S.C. § 19011(a)(4). The goal of the treaty and its implementing legislation is to eliminate the intentional pollution of the oceans by "oil and other harmful substances," as well as minimize "accidental discharge of such sul2stances." See Wilmina Shipping AS v. U.S. Dep't of Homeland Sec., 934 F.Supp.2d 1, 6 (D.D.C.2013) (citations omitted)..
The Secretary of the Department of Homeland Security is authorized "to administer and enforce" the Convention and to "prescribe any necessary or desired regulations to carry out" its requirements. 33 U.S.C. § 1903(a), (c)(1).[1] It is "unlawful to act in violation of the" Convention "or the regulations issued thereunder." 33 U.S.C. § 1907(a). Knowingly violating the law may give rise to both criminal and civil liability.
General authority to grant departur( clearance to foreign-flagged ships is ft Customs. See 46 U.S.C. § 60105(b). But a specific provision of the Act deals wit the enforcement of the Convention:
If any ship subject to the [Convention] is liable for a fine or civil penalty under this section, or if reasonable cause exists to believe that the ship, its owner, operator, or person in charge may be subject to a fine or civil penalty under this section, the Secretary of the Trea-sln'y [now DHS], upon request of the Secretary [of DHS], shall refuse or revoke the clearance required by section 60105 of Title 46. Clearance may be granted upon the filing of a bond or other surety satisfactory to the Secretary [of DHS].
33 U.S.C. § 1908(e). Both references to the Secretary now refer to the Secretary *328 of Homeland Security who supervises both Customs and the Coast Guard, but in accordance with regulations, Customs maintains authority to clear a vessel unless the Coast Guard requests otherwise, and it is the Coast Guard that has authority to accept a bond.
Appellants own and operate two foreign-flagged vessels: the M/V AGIOS EMILI-ANOS and the M/V STELLAR WIND. Each periodically docks at U.S. ports, in the course of its oceangoing business, to load or offload cargo. In the spring of 2011, the Coast Guard began receiving whistleblower complaints asserting violations of the Act. Specifically, it was claimed that the appellants’ vessels had falsified the oil record books required of all vessels when traveling over international waters and docking at U.S. ports. Upon initial investigation stemming from the complaints, the Coast Guard determined that it had reasonable cause to believe that the vessels’ operators had committed violations of the Act. Therefore the Coast Guard ordered Customs to withhold departure clearance.[2] The vessels were held for investigation for differing lengths of time, ranging from a couple of days to over a month.
As the district court noted, the vessels were eventually released, but not until appellants had both posted a bond and executed a “Security Agreement.” These agreements were required by the Coast Guard as a condition of release of the vessels. They were designed to allow the government to later prosecute its case if merited. As such, these agreements include several terms above and beyond the posting of a typical financial bond. They called for the vessel owners and operators to pay wages, housing, and transportation costs to crew members who remain in the jurisdiction, as well as facilitate their travel to court appearances, to encourage crew members to cooperate with the government’s investigation, ,to help the government serve subpoenas on foreign crew members located outside of the United States, to waive objections to both in per-sonam and in rem jurisdiction, and to enter an appearance in federal district court. After their release, the vessel owners initiated an administrative appeal with the Coast Guard to challenge the validity of the Security Agreements.
Meanwhile, the Coast Guard proceeded with its criminal prosecutions. Ultimately, the management associated with the AG-IOS EMILIANOS and STELLAR WIND pled guilty, and admitted to intentionally bypassing mandatory anti-pollution equipment on board and discharging oil waste directly into the waterways. Some among the crew on both ships had rerouted oily water around required water-oil separators and sludge incinerators, discharging it directly into the ocean. Those discharges were then hidden from the mandatory oil records book, and false entries that the environmental protection equipment was being used were made.
Appellants, having failed in all administrative appeals, challenge the nonfinancial Security Agreements that the Coast Guard demanded before granting departure clearance as beyond the Coast Guard’s statutory authority. The district court ruled for the government, stating that the matter of conditional departure clearance was committed to the Coast Guard’s discretion by law. The court did observe that the final sentence of § 1908(e), describing a “bond or other surety,” might well be limited to purely financial terms. But the court was' of the view that the language stating that “clearance may be granted upon the filing of a bond or other surety *329 satisfactory to the Secretary” gave the Department (the Coast Guard) unreviewable discretion, and therefore the court had no standards by which to judge the claim.
II.
Appellants challenge the district court’s holding on several grounds. Of course, they insist that the case is reviewable; that there are judicially acceptable standards to apply. Then, proceeding to the merits, appellants assert that only Customs — not the Coast Guard — has authority to withhold a ship’s clearance. And although the Coast Guard can require a bond (or other surety), it may not demand any nonfinancial conditions as part of the bond.[3]
The government reiterates its position before the district court; that we lack jurisdiction because the Coast Guard has unreviewable discretion to accept or reject a bond, and thereby prevent a ship’s departure. Moreover before us, for the first time, appellants’ standing is challenged and it is further claimed that the cases are moot. Turning to the surety, the government contends that the Coast Guard can insist on the nonfinancial conditions it imposed because such conditions are within the meaning of the terms “bond or other surety.” Indeed, it is argued that such conditions are commonly included in bonds. (The government’s brief boldly so asserts, but no examples nor dictionary definitions are cited, which is a novel approach to brief writing.) The government explains why the Coast Guard insisted on the nonfinancial conditions in these cases. It asserts — and appellants agree — that the financial terms of a bond referred to in the Act cover the ultimate liability of á ship owner, which can be determined only after a legal proceeding, either civil or criminal. In other words, nothing prevents the ship, after posting the bond, from sailing away. And if the government lacks sufficient evidence to present in court without the ship and its crew, the ship owner’s liability disappears.
We have little doubt as to our jurisdiction. Appellants clearly have standing, and the case is not moot, even if the ships have sailed. The government contends that the agreements have no ongoing legal effect. Apparently this is because the plea agreements were reached by some appellants in the interim between the filing of the original complaint and this appeal. But the government overlooks that two of the appellants never pled to, nor were they, as yet, charged with a crime. It also ignores the fact that Security Agreements with two of the parties have no expiration date at all, and even for those Security Agreements with a duration provision, language releasing the parties has not been clearly triggered. Finally, the government disregards the point that even the criminal pleas that were reached do not foreclose the government’s ability to seek further civil penalties, as allowed under the Act.
*330 Nor do we agree with the government and the district court that the Coast Guard's discretion is unreviewable. Although the Coast Guard may have wide discretion as to the amount of the bond it requires (we doubt that even that is totally unreviewable) there is no reason to believe that the legal question presented-whether the Coast Guard can impose nonfinan-cial conditions-is not suitable for judicial
On the other hand, appellants' lengthy discussion of the respective roles of the Coast Guard and Customs seems rather academic. After all, both entities are in the same Department under the common supervision of the Secretary of Homeland Security. In any event, it is clearly the Coast Guard under the Secretary's regulations that has the authority granted by the Secretary to "request" that Customs "refuse" clearance.[4]
Which brings us to the main issue in the case; whether the Coast Guard may require the nonfinancial conditions. Appellants point to the legislative history indicating that CongTess intended a bond or other surety to cover oniy financial liability for penalties imposed in civil or criminal proceedings. See H.R. No. 96-1224, reprinted in 1980 U.S.C.C.A.N. 4849. The government does not contest the House Report on which appellant relies, instead focusing on the phrase "satisfactory to the Secretary" as giving the Coast Guard broader authority. We find it unnecessary to decide the scope of the term "bond or other surety" because the first sentence of section 1908(e) gives the Coast Guard the requisite authority. It states that "[i]f any ship subject to the [Convention] . . . is liable for a fine or civil penalty ... or if reasonable cause exists to believe that the ship ... may be subject to a fine or civil penalty [Customs] . . upon request of the Secretary [the Coast Guard] ... shall refuse ... clearance," and as such it clearly provides authority in the Coast Guard to simply hold the ship in port until legal proceedings are completed.[5]
The nonfinancial conditions can, therefore, be thought of as simply the quid pro quo for allowing ships to depart. It is not necessary to consider whether those conditions are legitimately a part of "a bond or other surety" because they could be required independently of a bond. Although the Act authorizes the Secretary (Coast Guard) to request clearance of a ship if a bond is satisfactory, the Coast Guard is not required to accept a bond. (Here we agree with the district court that the words "may" and "satisfactory" are significant.) Indeed, as we understand the government, a financial bond, given its limited use, is ordinarily not satisfactory, so the Coast Guard need not accept bonds without accompanying honfinancial conditions.
We note that another statutory section provides a ship owner with a cause of action for the government's unreasonable *331 delay in granting departure clearance.[6] We need not consider whether the reasonableness of nonfinancial conditions is also subject to challenge because in the cases before us appellants have not asserted that the nonfinancial conditions are unreasonable.
Accordingly, we must assume that holding the ships and crew until a civil or criminal proceeding was completed was reasonable. And since the Coast Guard can hold the ship for such a purpose, it seems to follow that the Coast Guard can agree to notify Customs to release the ship only upon condition that a civil or criminal proceeding would not be jeopardized.
For the above reasons, we affirm the district court’s judgment.

So ordered.

. The authority to grant clearance, originally vested in the Secretary of the Treasury, was subsequently transferred to the Secretary of Homeland Security, and then further delegated to Customs. See 68 Fed.Reg. 28323 (May 23, 2003).

. The AGIOS EMILIANOS and STELLAR WIND were held at ports in Louisiana.

. Appellants claim that the Coast Guard could have used several other techniques to accomplish what it sought by way of the Security Agreements. See 18 U.S.C. § 3144 (authority to secure testimony of material witnesses); Fed.R.Crim.P. 15 (authority to take depositions of witnesses); 14 U.S.C. § 89(a) (war-rantless search, seizure, and arrest authority); Fed.R.Crim.P. 6 (grand jury powers); 28 U.S.C. § 1821; 28 C.F.R. Part 21 (authorizing and implementing procedures to pay .transportation, lodging and other expenses to secure witness testimony). But, they claim, such measures are not permissible under § 1908(e).

. See 19 C.F.R. §~ 4.60 a, 4.66a, 4.66c(a).

. Our concurring colleague suggests that we are bypassing the text and resorting to our own reasoning. We concede we are reasoning, but we are focusing on the meaning and necessary implication of the first sentence of section 1908(e), which of course is textual analysis. The concurrence does not directly dispute that in the absence of the second sentence of 1908(e), the first sentence would give the Coast Guard the requisite authority for the Security Agreements.
Nor do we understand why our own interpretation gives the Coast Guard any more authority than does our colleague's interpretation. After all, the concurrence contends that a "bond or other surety" can include any nonfinancial condition-lasting presumably indefinitely-so long as it is secured by a pot of money and labeled a bond.

. See 33 U.S.C. § 1904(h).